# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SOUNDEXCHANGE, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | )     Civil Action No. 19-999 (RBW) |
| v. | ) |
| | ) |
| MUSIC CHOICE, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OPINION

The plaintiff, SoundExchange, Inc. ("SoundExchange" or "the plaintiff"), brings this civil action pursuant to the Copyright Act of 1976 (the "Copyright Act"), 17 U.S.C. § 101, against the defendant, Music Choice, to recover unpaid royalties. See Complaint ("Compl.") ¶¶ 32–41, ECF No. 1. Currently pending before the Court is the issue of whether the Court should refer the question of regulatory interpretation raised in this case to the Copyright Royalty Board (the "Board") under the doctrine of primary jurisdiction. See Joint Report Pursuant to Local Rule 16.3 ("Joint Report") at 14–15, ECF No. 20; Order at 1 (Jun. 8, 2020), ECF No. 22. Upon careful consideration of the parties' submissions,[1] the Court concludes for the following reasons that referral to the Copyright Royalties Board (the "Board") is appropriate under the doctrine of primary jurisdiction.

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) Defendant Music Choice's Supplemental Brief Regarding Primary Jurisdiction ("Def.'s Suppl. Br."), ECF No. 24; and (2) SoundExchange's Supplemental Brief in Favor of Referral to the Copyright Royalty Board ("Pl.'s Suppl. Br."), ECF No. 25.

# I.     BACKGROUND

## A.     Statutory Background

Under the Copyright Act, a Business Establishment Service ("BES"), such as Music

Choice's BES, is "a service making transmissions of sound recordings under the limitation on

exclusive rights specified by [the Copyright Act]."  37 C.F.R. § 384.2 (2019).  The Copyright

Act allows a BES provider to make reproductions of copyrighted sound recordings that the BES

provider transmits to business establishments for use in the "ordinary course of [the

establishments'] business."  See 17 U.S.C. §§ 112(e)(1)(C), 114(d)(1)(C)(iv); Compl. ¶¶ 14, 16.

To make such reproductions, a BES provider must obtain a statutory license from the United

States Copyright Office that permits it to use, as part of the services it provides, "sound

recordings protected by federal law without having to negotiate license agreements with the

rights owners."  Compl. ¶ 2.  "Thereafter, a statutory licensee can use sound recordings . . . to its

commercial advantage so long as it complies with the requirements of the statutory license."  Id.

BES providers must report their usage of recordings, see id. ¶ 17, and pay statutory

royalties at rates prescribed by the Board.  See id. ¶ 3.  The Board consists of three Copyright

Royalty Judges ("CRJs") appointed pursuant to the Copyright Act.  See id.  Each CRJ must "be

an attorney who has at least [seven] years of legal experience."  17 U.S.C. § 802(a)(1).

Additionally, at least one CRJ must "have significant knowledge of copyright law," and another

CRJ must "have significant knowledge of economics."  Id.

In setting royalty rates, the Board "presides over extensive administrative proceedings,

which can involve scores of witnesses and voluminous documents, before issuing its

determinations and promulgating regulations."  SoundExchange, Inc. v. Sirius XM Radio Inc.

("Sirius XM"), 65 F. Supp. 3d 150, 152 (D.D.C. 2014) (citing 17 U.S.C. § 803).  Specifically,

the Board administers proceedings to "determine royalty rates" and "determine distribution of royalty fees."  17 U.S.C. § 803(b)(2)(D)(i)–(ii); see also id. § 803(b)(3)(A)(i)–(ii).  The Board may also adopt royalty rates and terms as part of a settlement among "some or all of the participants in a proceeding[.]"  17 U.S.C. § 801(b)(7)(A).  However, the Board "may decline to adopt the [settlement] agreement as a basis for statutory terms and rates for participants that are not parties to the agreement" "if any participant [in the proceeding] objects to the agreement and the [Board] conclude[s], based on the record before them if one exists, that the agreement does not provide a reasonable basis for setting statutory terms or rates."  Id. § 801(b)(7)(A)(ii).

In making its determinations, the Board "may consult with the Register of Copyrights [(the "Register")] on any matter other than a question of fact."  Id. § 802(f)(1)(A)(i). Additionally, the Board must request a written decision from the Register resolving any "novel material question of substantive law concerning an interpretation" of the Copyright Act.  Id. § 802(f)(1)(B)(i).

At the heart of the parties' dispute in this case is the interpretation of the Board's regulations, specifically concerning the meaning of "Gross Proceeds."  See Joint Report at 2–3; see Compl. ¶¶ 26–28.  The current statutory royalty rate for BES providers is 12.75% of the licensee's "'Gross Proceeds' derived from the use in such service of musical programs that are attributable to [copyrighted] recordings."  Pl.'s Suppl. Br. at 3 (quoting 37 C.F.R. § 384.3(a)(1) (2020)).  The original formulation of "Gross Proceeds" was determined by a Copyright Arbitration Royalty Panel ("CARP") in a 2002 royalty-rate setting proceeding, during which it "determined that the provider of a business establishment service should pay royalties at a statutory rate that was a percentage of 'the Licensee's annual gross proceeds derived from the use in such broadcast service of the musical programs which are attributable to copyrighted

recordings.'" Id. at 4 (quoting Report of the Copyright Arbitration Royalty Panel in Docket No.

2000–9 (Feb. 20, 2002)).  When the Register subsequently reviewed the CARP's decision,

however, it recommended clarification to the definition of "Gross Proceeds."  See Determination

of Reasonable Rates and Terms for the Digital Performance of Sound Recordings and Ephemeral

Recordings, 67 Fed. Reg. 45,240, 45,268 (July 8, 2002) (finding that the CARP's definition of

"Gross Proceeds" was not defined with specificity and suggesting an expanded definition).  The

Register's recommendation ultimately led to the following definition which currently defines

"Gross Proceeds" as:

> [A]ll fees and payments, including those made in kind, received from any source
> before, during or after the License Period that are derived from the use of sound
> recordings during the License Period pursuant to 17 U.S.C. [§] 112(e) for the sole
> purpose of facilitating a transmission to the public of a performance of a sound
> recording under the limitation on exclusive rights specified in 17 U.S.C.
> [§] 114(d)(1)(C)(iv).

37 C.F.R. § 384.3(a)(2); see Pl.'s Suppl. Br. at 5.

Although the definition recommended by the Register "is similar to the one in

[s]ection 834.3(a)(2) today[,]" Pl.'s Suppl. Br. at 5; compare 67 Fed. Reg. at 45,268, with

37 C.F.R. § 384.3(a)(2), these regulations have a long history that involves several statutory

revisions.  After the Register made its recommendation, "regulations implementing a 2003

industry settlement relocated the relevant regulations and made some changes in wording."  Pl.'s

Suppl. Br. at 5; see Digital Performance Right in Sound Recordings and Ephemeral Recordings,

69 Fed. Reg. 5693, 5698 (Feb. 6, 2004).  Then, in 2004, Congress passed the Copyright Royalty

Distribution and Reform Act, which transferred the CARP's jurisdiction, including its

jurisdiction over BES royalty rates and terms, to the Board.  See generally Pub. L. No. 108-419,

118 Stat. 2341.  With this new responsibility, the Board "implement[ed] [a] 2007 industry

settlement [, which] restated the [BES] rates and terms in a new CFR part with some additional

editorial changes."  Pl.'s Suppl. Br. at 5; see Determination of Rates and Terms for Business

Establishment Services, 73 Fed. Reg. 16,199, 16,199-200 (Mar. 27, 2008).  Thereafter, "[t]he

Board extended the regulations with further wording changes in implementing industry

settlements in 2012 and 2018."  Pl.'s Suppl. Br. at 5; see Determination of Rates and Terms for

Business Establishment Services, 78 Fed. Reg. 66,276, 66,277 (Nov. 5, 2013); Determination of

Royalty Rates and Terms for Making Ephemeral Copies of Sound Recordings for Transmission

to Business Establishments, 83 Fed. Reg. 60,362, 60,362–63 (Nov. 26, 2018) (publishing final

regulations setting rates and terms for the making of an ephemeral recording of a sound

recording by a BES for the period of January 1, 2019, through December 31, 2023).

### B.      Factual Background

SoundExchange is a "non-profit organization authorized to collect and distribute to

performing artists and copyright owners certain statutory royalties owed for the use of sound

recordings protected under [the Copyright Act]."  Compl. ¶ 1.  The Board "has designated

SoundExchange as the sole entity in the United States to collect royalties from statutory licensees

and distribute these royalties to performing artists and copyright owners[.]"  Id. ¶ 11.

Furthermore, SoundExchange has authority to initiate independent audits of music service

providers to verify the royalty statements and payments made to it.  See id. ¶ 7 (citing 37 C.F.R.

§ 384.6).

Music Choice is a digital music service provider that uses statutory licenses to "provide[]

several different types of digital music services, including a residential consumer audio service

delivered by cable and satellite television providers and an audio service provided to business

establishments."  Id. ¶ 4.  Music Choice's BES offers "over [fifty] channels of CD[-]quality

music" to help businesses "create the proper ambiance."  Id.

In 2016, SoundExchange "engaged an independent auditor to verify the royalty statements provided by Music Choice to SoundExchange for its BES for the period January 1, 2013 through December 31, 2016." Id. ¶ 7. According to SoundExchange, the independent auditor "discovered that Music Choice systematically underpaid statutory royalties for its BES . . . by consistently making an allocation of the fees and payments it receives for providing its BES in a manner not contemplated by the [Board's] regulations, and as a result, underreporting its 'Gross Proceeds' to SoundExchange." Id.

SoundExchange initiated this civil action in this Court on April 10, 2019, seeking recovery of unpaid royalties and late fees under 37 C.F.R. § 384.3, 384.4, as well as unpaid verification fees under 37 C.F.R. § 384.6(g). See Compl. ¶¶ 32–41. On June 24, 2019, Music Choice filed its answer, and thereafter moved to transfer this case to the Southern District of New York on venue grounds under 28 U.S.C. § 1404(a) (2020). See generally Def.'s Motion to Transfer Case. On February 14, 2020, this Court denied Music Choice's motion to transfer. See SoundExchange, Inc. v. Music Choice, 2020 WL 759197, at *1 (D.D.C. Feb. 14, 2020) (Walton, J.).

The Court held an initial scheduling conference in this case on June 5, 2020. See Order at 1 (June 8, 2020), ECF No. 22. During the initial scheduling conference, the parties raised the issue of whether the Court should "refer the question of regulatory interpretation raised by [the] case to the Copyright Royalty Board pursuant to the doctrine of primary jurisdiction." Joint Report at 14 (citing United States v. W. Pac. R. Co, 352 U.S. 59, 63–64 (1956)). Specifically, the parties indicated that they "dispute how the term 'Gross Proceeds' should be interpreted and reported pursuant to the [Board]'s regulations." Joint Report at 2. Music Choice asserts that "its 'Gross Proceeds' are only an allocated portion of its actual proceeds corresponding to music

6

channels offered <u>solely</u> as part of its BES service." <u>Id.</u> at 2 (emphasis in original).
SoundExchange, however, contends that "Music Choice must pay BES statutory royalties on
fees and payments it receives from providing music channels used in its BES service, even if
Music Choice also provides such channels as part of a different service." <u>Id.</u> at 2–3.  Therefore,
SoundExchange asserts that "Music Choice has consistently underreported its 'Gross Proceeds'
based on its incorrect interpretation of the regulations, resulting in a systematic underpayment of
BES statutory royalties." <u>Id.</u> at 3.

On June 8, 2020, the Court ordered the parties to file supplemental briefs addressing (1)
whether the Board has jurisdiction over this matter, and (2) whether the Court should refer the
question of regulatory interpretation to the Board under the doctrine of primary jurisdiction.  <u>See</u>
Order at 1 (June 8, 2020), ECF No. 22.  These issues and the parties' corresponding arguments
from their supplemental briefs are the subject of this Memorandum Opinion.

## II.      ANALYSIS

SoundExchange argues that the Court "should refer the question of regulatory
interpretation raised by this case to the Board under the doctrine of primary jurisdiction" because
"[t]he Board has the expertise and jurisdiction necessary to resolve the parties' dispute over
interpretation of the Board's royalty rate regulation at 37 C.F.R. § 384.3(a), and it is the tribunal
best situated to do so."  Pl.'s Suppl. Br. at 1.  In response, Music Choice argues that the Court
should not refer the issue to the Board because: (1) the Board "does not have <u>any</u> authority to
enforce the statutory license regulations or resolve payment disputes[,]" Def.'s Suppl. Br. at 1
(emphasis in original); and (2) "the questions presented by this case—interpretation of
regulations and statutes of that authority to the unique facts of this case—are of the sort that
district courts routinely resolve[,]" <u>id.</u>  The Court will address the parties' arguments in turn, first

considering whether the Board has jurisdiction over this matter, and if so, then considering

whether referral to the Board is warranted pursuant to the primary jurisdiction doctrine.

## A.      Whether the Board Has Jurisdiction Over This Matter

SoundExchange argues that the Board has jurisdiction over the regulatory interpretation

at issue here because the Board has continuing jurisdiction "to interpret and clarify its regulations

in 37 C.F.R. § 384.3(a)."  Pl.'s Suppl. Br. at 11 (citing Sirius XM, 65 F. Supp. 3d at 156).  In

response, Music Choice argues that "[t]he Board's statutorily limited jurisdiction [ ] does not

extend to this case, which is a private commercial dispute for money damages."  Def.'s Suppl.

Br. at 4.  Music Choice further argues that "the Board's continuing jurisdiction to reopen and

make corrections to its own prior determinations does not give it continuing jurisdiction over the

[BES] license regulations in dispute[]" because: (1) "[t]hose regulations were drafted and

originally by . . . [the CARP,]" and (2) "[t]he Board itself has never presided over a contested

[BES] license rate setting proceeding[.]"  Id. at 1–2 (emphasis in original).

Pursuant to the Copyright Act and the Administrative Procedure Act, the Board may

"make determinations and adjustments of reasonable terms and rates of royalty payments[,]"

including those relating to BES licenses.  17 U.S.C. §§ 801(b)(1), 803(a)(1); see id. § 803(d)(3);

5 U.S.C. § 706(2)(A).  The Board generally "has no cause to address [ ] questions . . . outside of

the context of the ratemaking and distribution proceedings otherwise within its statutory

purview."  Brief for the United States as Amicus Curiae in Support of Neither Party at 11;

SoundExchange, Inc. v. Muzak LLC, 854 F.3d 713 (D.C. Cir. 2017) (No. 16-7041).  However,

the Board "may issue an amendment . . . to correct any technical or clerical errors in the

determination or to modify the terms, but not the rates, of royalty payments in response to

unforeseen circumstances that would frustrate the proper implementation of such determination."

17 U.S.C. § 803(c)(4). The Board's "power to 'correct any technical . . . errors' in determinations encompasses the power to resolve ambiguity in the meaning of regulations adopted pursuant to those determinations[,]" and "[s]uch a correction is 'technical' in the sense that it merely clarifies existing regulations to ensure they are applied in the manner intended by the [Board]." Scope of the Copyright Royalty Judges' Continuing Jurisdiction, 80 Fed. Reg. 25,333, 25,335 (May 4, 2015) (footnote omitted); see Sirius XM, 65 F. Supp. 3d at 156 ("[C]larification of the terms [of royalty payment rates] . . . is within the [Board's] continuing jurisdiction."). The Board is "in the best position to provide this type of interpretive guidance, given [its] familiarity with the extensive record on which the regulations are based and [its] general 'technical and policy expertise.'" Scope of the Copyright Royalty Judges' Continuing Jurisdiction, 80 Fed. Reg. at 25,335 (quoting Sirius XM, 65 F. Supp. 3d at 155). "This approach is also consistent with the general principles of administrative law, under which courts regularly defer to agencies' reasonable interpretations of ambiguous regulations." Id. (citing Auer v. Robbins, 519 U.S. 452, 461 (1997)).[2]

Here, the Court agrees with SoundExchange that the Board has continuing jurisdiction to clarify its BES regulations. See Pl.'s Suppl. Br. at 12–13. As SoundExchange correctly notes, although the CARP originally formulated the regulations at issue here, "[t]here is nothing in [s]ection 803(c)(4) suggesting that the Board's jurisdiction depends on its having made up a regulation out of whole cloth." Id. at 12. Given the Board's explicit continuing jurisdiction over the "clarification of existing regulations," Scope of the Copyright Royalty Judges' Continuing

---

[2] As a preliminary matter, the Court notes that the Board's definition of "Gross Proceeds" in 37 C.F.R. § 384.3(a)(2) is "ambiguous and do[es] not, on [its] face, make clear whether [Music Choice's] approaches were permissible under the regulations." See Sirius XM, 65 F. Supp. 3d at 155; 37 C.F.R. § 384.3. Therefore, the Court will proceed to assess whether the Board has jurisdiction over this matter, and if so, whether referral to the Board is warranted pursuant to the primary jurisdiction doctrine.

Jurisdiction, 80 Fed. Reg. at 25,335, and the analogous, settled power of agencies to provide reasonable interpretation of ambiguous regulations," id. (citing Auer, 519 U.S. at 461 (1997)), the Board's continuing jurisdiction is not affected by the original source of the regulations at issue.  Additionally, the Court finds persuasive SoundExchange's argument that, although the Board's most recent issuance of these regulations arose out of an industry settlement, see Determination of Royalty Rates and Terms for Making Ephemeral Copies of Sound Recordings for Transmission to Business Establishments, 83 Fed. Reg. at 60,362–63 (publishing final regulations setting rates and terms for the making of an ephemeral recording of a sound recording by a BES for the period of January 1, 2019, through December 31, 2023), "the regulations are nonetheless a determination of statutory royalty rates and terms by the Board issued at the conclusion of a rate-setting proceeding[,]" Pl.'s Suppl. Br. at 12; see 17 U.S.C. § 801(b)(7)(A) (describing the Board's adoption of industry agreements "as a basis for statutory terms and rates").  Therefore, the Court concludes that the Board's regulations arising out of its adoption of industry agreements are similarly situated to other Board rate regulations such that the Board may exercise continuing jurisdiction them pursuant to section 803(c)(4) of the Copyright Act.  See 17 U.S.C. § 803(c)(4) (authorizing the Board "to correct any technical or clerical errors in the determination or to modify the terms, but not the rates, of royalty payments in response to unforeseen circumstances that would frustrate the proper implementation of such determination").[3]

---

[3] Before addressing the question of whether the Board has continuing jurisdiction, Music Choice first argues that "this matter is not within the ratemaking jurisdiction of the Board."  Def.'s Suppl. Br. at 7.  Specifically, Music Choice contends that the Board lacks jurisdiction to address the parties' payment dispute, because "this dispute arises neither as part of, nor in a proceeding related to, any ratemaking over which the Board may preside, and thus does not fall within the Board's [ratemaking] authority[.]"  Id. at 6.  SoundExchange does not challenge this point.  Rather, SoundExchange only asserts that the Board "has jurisdiction to interpret and clarify its regulations in 37 C.F.R. § 384.3(a)" pursuant to the Board's continuing jurisdiction.  Pl.'s Suppl. Br. at 11; see Sirius XM, 65 F. Supp. 3d at 156 (finding that clarification of the terms of satellite digital audio radio service royalty rates—

(continued . . .)

Music Choice's arguments against the Board having continuing jurisdiction are unpersuasive for several reasons.  First, Music Choice argues that the parties' dispute does not fall within the Board's continuing jurisdiction because "SoundExchange is not seeking the correction of a technical error made by the Board or a change to the regulations based upon unforeseen circumstances in this case[.]"  Def.'s Suppl. Br. at 7.  However, as another member of this Court noted in a similar case, because "[n]either party is asking for a change to rates[,]" but rather, "only a clarification of the terms[,]" this falls squarely "within the [Board's] continuing jurisdiction."  Sirius XM, 65 F. Supp. 3d at 156; see id. at 156–57 (finding that the issue of "[w]hether [the Board] set the rates intending the types of revenue at issue to be included in or excluded from the gross revenue calculation is a question best posed to the [Board] itself.").[4]  Indeed, if the Board concludes that Music Choice's calculations of its gross proceeds are impermissible under the Board's regulations, nothing precludes SoundExchange from seeking and award for damages in this Court.  See id.

Second, Music Choice argues that "[t]he Board's continuing jurisdiction to reopen its own prior proceedings does not extend to proceedings conducted by other distinct agencies[,]" Def.'s Suppl. Br. at 8–9, and in particular, those proceedings conducted by the CARP, see id. (emphasizing that "unlike the Board, . . . [the CARP] had no continuing jurisdiction over their ratemaking proceedings after the final determination was issued[,]" and "[t]here is nothing in the

---

(. . . continued)
specifically, the term 'gross revenues' in the Board's regulations—was within the Board's continuing jurisdiction, and referring the royalty underpayment action to the Board).  Therefore, the Court will proceed to address Music Choice's arguments concerning the Board's continuing jurisdiction.

[4] In 2013, SoundExchange brought an underpayment royalty action against Sirius XM, there the parties  similarly disputed the meaning of terms in the Board's regulations.  See Sirius XM, 65 F. Supp. 3d at 153.  But there, SoundExchange took the opposite position "that the Board did not have the power to accept a referral from the [C]ourt under the doctrine of primary jurisdiction."  Pl.'s Suppl. Br. at 11; see Sirius XM, 65 F. Supp. 3d at 156.  Here, however, SoundExchange acknowledges that, while it "argued against referral and Board jurisdiction then, its arguments did not prevail[,]" Pl.'s Suppl. Br. at 2, and another member of this Court took the opposition position and "granted Sirius XM's request for such a referral over SoundExchange's objection[,]" id. at 3.

continuing jurisdiction provision even hinting that Congress intended to grant the Board

jurisdiction to interpret the regulations a different agency crafted—much less retroactive

jurisdiction to reopen proceedings conducted before a different agency under a statute

withholding continuing jurisdiction from that agency").  However, the CARP is not merely a

"different agency" as Music Choice represents, see Def.'s Suppl. Br. at 8, but rather, the CARP

is the Board's predecessor agency, the Copyright Royalty Distribution and Reform Act having

transferred jurisdiction over BES royalty rates and terms to the Board as the CARP's successor

agency.  See Determination of Rates and Terms for Business Establishment Services, 73 Fed.

Reg. at 16,199.  Since its inception, the Board has made determinations implementing industry

settlements based on these regulations.  See Determination of Royalty Rates and Terms for

Making Ephemeral Copies of Sound Recordings for Transmission to Business Establishments,

83 Fed. Reg. at 60,362; Determination of Rates and Terms of Business Establishment Services,

78 Fed. Reg. 66,276, 66,277 (Nov. 5, 2013); Determination of Rates and Terms for Business

Establishment Services, 73 Fed. Reg. at 16,199–200.  Indeed, it appears that the provision for

continuing jurisdiction was adopted in response to perceived failings in the CARP system.  See

H.R. Rep. 108-408, at 36 (2004) (noting that the Copyright Office and other parties had

requested inclusion of continuing jurisdiction powers that were not included under the CARP

system on its face).  Music Choice's contrary interpretation would result in the following

illogical outcome: although the Board would retain continuing jurisdiction over its own

determinations, it would be unable to correct errors or respond to unforeseen circumstances

arising out of older determinations made by the CARP.  Such an outcome would run contrary to

Congress's intent expressed in § 803(c)(4) of the Copyright Act.  See 17 U.S.C. § 803(c)(4)

(noting that the Board "may issue an amendment . . . to correct any technical or clerical errors in

the determination or to modify the terms, but not the rates, of royalty payments in response to

unforeseen circumstances that would frustrate the proper implementation of such

determination.").

Third and finally, Music Choice asserts that "[t]he Board's continuing jurisdiction to

provide interpretive guidance does not extend to regulations that were not the subject of a

contested proceeding before the Board and were neither drafted nor substantively considered by

the Board[.]"  Def.'s Suppl. Br. at 9.  In other words, Music Choice contends that the Board's

continued jurisdiction is predicated upon its "unique familiarity with [the] regulations" at issue,

which "exists only as the continuation of a proceeding actually litigated before the Board, and in

which a record was developed."  Id. at 10.  Music Choice further argues that no such evidentiary

record exists here, "in the context of any of the [BES] license proceeding settlements—all of

which the Board accepted as submitted . . . without any evidentiary record ever having been

created."  Id. at 11–12.  According to Music Choice, this case is "fundamentally different" from

Sirius XM, which "involved a complex record developed before the Board, including many

thousands of pages of conflicting documents, several weeks of live testimony and cross

examination, and extensive briefing."  Id. at 12; see Sirius XM, 65 F. Supp. 3d at 152

(determining that referral under primary jurisdiction was appropriate due to the Board's

"technical and policy expertise").[5]

---

[5] As further support for this argument, Music Choice also contends that case is akin to Muzak, in which the District
of Columbia Circuit declined to invoke the primary jurisdiction doctrine because the parties' dispute over the
application of the statutory term, "preexisting subscription service," was "divorced from a rate proceeding."  Muzak,
854 F.3d at 718; see Def.'s Suppl. Br. at 13.  However, the Court agrees with SoundExchange that this case is
distinguishable from Muzak.  As SoundExchange correctly notes, "the Muzak case turned on interpretation of a
statutory provision[—]the definition of the term 'preexisting subscription service' in 17 U.S.C. § 114(j)(11)[,]" Pl.'s
Suppl. Br. at 13 (emphasis in original); see 854 F.3d at 716.  Here, however, "[t]his case, like the Sirius XM case,
turns on interpretation of the Board's regulations."  Pl.'s Suppl. Br. at 13; see Sirius XM, 65 F. Supp. 3d at 156
(noting that the "gross revenue exclusions" in the Board's regulations, 37 C.F.R. § 382.11(3)(vi)(B) were
"ambiguous" and referring the matter to the Board under the doctrine of primary jurisdiction).  Indeed, as noted
                                                                                              (continued . . .)

Music Choice's arguments here are also unconvincing.  Although Music Choice correctly notes that Sirius XM involved a more substantial evidentiary record than exists in this case, see Sirius XM, 65 F. Supp. 3d at 156 (noting that the Board "heard weeks of testimony and reviewed scores of exhibits submitted by these two parties" in two prior proceedings that determined the rates and terms at issue), the Court disagrees with Music Choice's contention that determinations implementing industry settlements may not form the basis for the Board exercising continuing jurisdiction.  As SoundExchange correctly notes, in Sirius XM, after the court in Sirius XM referred that case to the Board, the Register "then opined that the Board has jurisdiction to clarify its regulations," Pl.'s Suppl. Br. at 2 (citing Scope of the Copyright Royalty Judges' Continuing Jurisdiction, 80 Fed. Reg. 25,333 (May 4, 2015)), "and the Board ultimately issued a decision doing so[,]" id. (citing Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services, 82 Fed. Reg. 56,725 (Nov. 30, 2017)).  The Register observed that the case "highlighted a situation in which the Board had previously relied on its continuing jurisdiction under Section 803(c)(4) to modify a determination implementing an industry settlement."  Pl.'s Suppl. Br. at 12.  Specifically, the Register explained that, in 2009, the Board modified a determination that implemented a partial industry settlement regarding "royalty payments for making and distributing phonorecords of musical works under 17 U.S.C. [§] 115."  Scope of the Copyright Royalty Judges' Continuing Jurisdiction, 80 Fed. Reg. at 25,335 (finding that the Board could codify corrections identified by the Register under its continuing jurisdiction in order to "clarify potential confusion facing users of the license at

---

(. . . continued)

previously, this case turns on the interpretation of the term "Gross Proceeds" in the Board's regulations at 37 C.F.R. § 384.3(a)(2), rather than a question of statutory interpretation.  Accordingly, the Court concludes that the Sirius XM case is analogous here, and that the issue of whether the Board "intend[ed] the types of revenue at issue to be included in or excluded from the gross [proceeds] calculation is a question best posed to the [Board] itself."  Sirius XM, 65 F. Supp. 3d at 156 (noting that the Board's "interpretation of its own regulations . . . is owed great deference.").

issue" and "promote an efficient administration of the applicable license"); see also Mechanical and Digital Phonorecord Delivery Rate Determination Proceeding, 74 Fed. Reg. 6,832, 6,833 (Feb. 11, 2009) (holding that continuing jurisdiction was applicable even regarding the participants' partial agreement, and that clarification would aid users of the license at issue— whether or not they were a party to the partial agreement.).  Given this prior authority, the Court sees no compelling reason why the Board should not exercise its continuing jurisdiction in the same manner here.

Accordingly, the Court concludes the Board has continuing jurisdiction to offer interpretive guidance in this case.  Having reached this conclusion, the Court must next assess whether it should refer the question of regulatory interpretation raised by this case to the Board under the primary jurisdiction doctrine.

**B.     Whether the Court Should Refer This Matter to the Board Under the Primary Jurisdiction Doctrine**

SoundExchange argues that "this Court should refer the question of regulatory interpretation raised by this case to the Board under the doctrine of primary jurisdiction" because "[t]he Board has the expertise and the jurisdiction necessary to resolve the parties' dispute over interpretation of the Board's royalty rate regulation at 37 C.F.R. § 384.3(a), and it is the tribunal best situated to do so."  Pl.'s Suppl. Br. at 1.  In response, Music Choice responds that, even if the Board has limited jurisdiction to provide guidance, the Court should not refer the matter to the Board because "[n]one of the relevant factors weigh in favor of" referral, Def.'s Suppl. Br. at 2, and "[f]airness and efficiency weigh in favor of the Court exercising its discretion to simply adjudicate the entire matter now in a single streamlined proceeding, rather than referring any part of it to the Board[,]" id. at 3.

"The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." W. Pac. R.R. Co., 352 U.S. at 63.  Primary jurisdiction "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body[,]" id. at 63–64, and "in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views[,]" id. at 64.  "The primary jurisdiction doctrine rests on both a concern for uniform outcomes . . . and on the advantages of allowing an agency to apply its expert judgment[.]" Allnet Commc'n Serv., Inc. v. Nat'l Exch. Carrier Ass'n, 965 F.2d 1118, 1120 (D.C. Cir. 1992).  "Expertise . . . is not merely technical but extends to the policy judgments needed to implement an agency's mandate." Id.

"This doctrine should, however, be invoked sparingly." APCC Servs., Inc. v. WorldCom, Inc., 305 F. Supp. 2d 1, 13 (D.D.C. 2001) (citing United States v. McDonnell Douglas Corp., 751 F.2d 220, 224 (8th Cir. 1984)).  "[T]he [C]ourt must always balance the benefits of seeking the agency's aid with the need to resolve disputes fairly yet as expeditiously as possible." Id. (quoting Miss. Power & Light Co. v. United Gas Pipeline Co., 532 F.2d 412, 419 (5th Cir. 1976), cert. denied, 429 U.S. 1094 (1977)).  Because referral often results in added expense and delay to the litigants, "when the agency's position is sufficiently clear or nontechnical or when the issue is peripheral to the main litigation, courts should be very reluctant to refer." Miss. Power & Light Co., 532 F.2d at 419.  Nevertheless, it is well-established that "the doctrine exists for the proper distribution of power between judicial and administrative parties and not for the convenience of the parties." Red Lake Band of Chippewa Indians v.

Barlow, 846 F.2d 474, 476 (8th Cir. 1988) (quoting Distrigas of Mass. Corp. v. Boston Gas Co.,

693 F.2d 1113, 1117 (1st Cir. 1982)).

"No fixed formula exists for applying the doctrine of primary jurisdiction."  W. Pac. R.R.

Co., 352 U.S. at 64.  Instead, courts must conduct a case-by-case analysis based on "whether the

reasons for the existence of the doctrine are present and whether the purposes it serves will be

aided by its application in the particular litigation."  Id.  These purposes include "the desirable

uniformity which would obtain if initially a specialized agency passed on certain types of

administrative questions" and "the expert and specialized knowledge of the agencies involved."

United States v. Philip Morris USA, Inc., 787 F. Supp. 2d 68, 78 (D.D.C. 2011).  Courts

generally consider four factors in deciding whether to invoke primary jurisdiction:

> (1) whether the question at issue is within the conventional expertise of judges;
> (2) whether the question at issue lies particularly within the agency's discretion or requires the exercise of agency expertise;
> (3) whether there exists a substantial danger of inconsistent rulings; and
> (4) whether a prior application to the agency has been made.

Id. (quoting Himmelman v. MCI Commc'ns Corp., 104 F. Supp. 2d 1, 4 (D.D.C. 2000)).  "If the

[C]ourt concludes the doctrine does apply, then the [C]ourt may stay or dismiss without

prejudice the proceedings before it while the parties present the issue to the appropriate

administrative agency."  Sirius XM, 65 F. Supp. 3d at 154 (citing Reiter v. Cooper, 507 U.S.

258, 268–69 & n.3 (1993)).  However, "[w]here no administrative remedy exists, the doctrine of

primary jurisdiction does not apply."  Rohr Indus., Inc. v. Wash. Metro. Area Transit Auth., 720

F.2d 1319, 1323 (D.C. Cir. 1983) (quoting United States v. Elrod, 627 F.2d 813, 818 (7th Cir.

1980)); see Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co., 341 U.S. 246, 254 (1951) ("[W]e

know of no case where the court has ordered reference of an issue which the administrative body

would not itself have jurisdiction to determine in a proceeding for that purpose.").

SoundExchange argues that the Court should refer this matter to the Board based on each of the four primary jurisdiction factors.  The Court will address each of these factors in turn.

### 1.   Whether the Question at Issue Is Within the Court's Conventional Expertise or Requires the Exercise of the Board's Expertise

SoundExchange argues that "[r]esolving this dispute will require an understanding of digital music services, the technologies they employ, business models and accounting, as well as an exercise of the discretion provided to the Board under the governing statutory royalty rate standard[,]" none of which are matters "within the conventional expertise of judges."  Pl.'s Suppl. Br. at 9 (internal citation omitted).  SoundExchange also argues that these issues are clearly "within the [Board's] discretion or require[] the exercise of [the Board's] expertise" because "[t]he Board is the agency responsible for setting statutory royalty rates that satisfy particular statutory standards, and the agency that promulgated these regulations."  Id.  In other words, SoundExchange asserts that "the present dispute falls squarely within the technical and policy expertise of the Board."  Id.

In response, Music Choice argues that "federal courts are the traditional venue to resolve royalty payment disputes—such as this one—that turn on interpretation of copyright statutes or regulations."  Def.'s Suppl. Br. at 16.  Music Choice further asserts that "the Board has no unique knowledge or expertise with respect to the statutory license or disputed regulatory language at issue[]" because it "did not draft the disputed regulatory language; has never presided over a single contested proceeding for the Business Establishment License; and consequently has never heard any testimony or other evidence related to the license, market segment, or regulatory definition at issue."  Id. at 18.  Finally, Music Choice argues that "if the mere presence of [ ] a dispute [regarding statutory or regulatory interpretation] were enough to

warrant invocation of primary jurisdiction, the Board could be overwhelmed with referrals that it was never intended—nor budgeted—to handle."  Id.

The first factor in assessing primary jurisdiction requires the Court to "assess whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise."  Philip Morris, 787 F. Supp. 2d at 78 (internal quotations and citation omitted); see Himmelman, 104 F. Supp. 2d at 4 (emphasizing that "the [C]ourt should defer to the appropriate specialized agency in cases that require administrative expertise and raise 'issues of fact not within the conventional experience of judges'") (citing Far East Conference v. United States, 342 U.S. 570, 574 (1952)).  "The second factor . . . concerns 'whether the question at issue is particularly within the agency's discretion.'"  Philip Morris, 787 F. Supp. 2d at 78 (quoting Ellis v. Tribune Television Co., 443 F.3d 71, 83 (2d Cir. 2006)).

Here, while the Court believes it would have the capacity to actively engage the issues presented by this case, the Court ultimately agrees with SoundExchange that the dispute "falls squarely within the technical and policy expertise of the Board[,]" Pl.'s Suppl. Br. at 9, and is not "within the conventional expertise of judges[,]" id.; see Philip Morris, 787 F. Supp. 2d at 78.  As the Court previously noted, the Board's mandate is in part to determine "reasonable rates and terms of royalty payments" for BES statutory licenses, 17 U.S.C. § 114(f), based on the CRJs' technical expertise in copyright law and economics, see 17 U.S.C. § 802(a)(1).  Further, "the expertise relevant to a primary jurisdiction decision 'is not merely technical but extends to the policy judgments needed to implement an agency's mandate.'"  Sirius XM, 65 F. Supp. 3d at 156 (quoting Allnet, 965 F.2d at 1120)).  Courts must be particularly deferential to the Board because

of the "difficult and multifaceted decisions delegated to [its] policy judgement[.]"  Id.  As the

Circuit has noted:

> First, the agency is required to estimate the effect of the royalty rate on the future
> of the music industry, which requires a forecast of the direction in which the
> future public interest lies based on the expert knowledge of the agency.  Second,
> the agency has legislative discretion in determining copyright policy in order to
> achieve an equitable division of music industry profits between the copyright
> owners and users.  Finally, the statutory factors pull in opposing directions, and
> reconciliation of these objectives is committed to the agency as part of its
> mandate to determine reasonable royalty rates.

SoundExchange, Inc. v. Librarian of Cong., 571 F.3d 1220, 1223–24 (D.C. Cir. 2009) (internal

quotation marks, citations, and alterations omitted).

Sirius XM is particularly instructive here.  65 F. Supp. 3d 150.  In that case, another

member of this Court found that the Board's use of the phrase "gross revenue exclusions" in a

final determination of copyright royalty rates to be paid by satellite digital audio radio services

was "ambiguous," and therefore held that referral under the doctrine of primary jurisdiction was

appropriate due to the Board's "technical and policy expertise[.]"  Sirius XM, 65 F. Supp. 3d

at 155.  Music Choice attempts to distinguish this case from Sirius XM by asserting that here the

Board has "no unique knowledge or expertise with respect to the statutory license or disputed

regulatory language at issue[]" because it "did not draft the disputed regulatory language; has

never presided over a single contested proceeding for the [BES]; and consequently has never

heard any testimony or other evidence related to the license, market segment, or regulatory

definition at issue."  Def.'s Suppl. Br. at 17–18.  Although the parties in Sirius XM had engaged

previously in contested proceedings to determine the relevant royalty rate, see 65 F. Supp. 3d

at 152, there is no support for Music Choice's contention that the Board lacks unique knowledge

of expertise merely because it has only made determinations in the context of implementing

industry settlements.  According to the requirements of the Board, the composition of the three-

member Board at any given time must include one judge with "significant knowledge of copyright law," and one judge with "significant knowledge of economics," and the chief judge must have "at least 5 years of experience in adjudications, arbitrations, or court trials."  17 U.S.C. § 802(a)(1).  Most notably, Steven Ruwe, the current judge designated as the Board member with significant knowledge of copyright law has "15 years' experience in copyright and intellectual property law," having "served as assistant general counsel in the Copyright Office's Office of the General Counsel" where he had responsibility for "many issues, including statutory licensing, CRB rate determinations, regulations, policy studies, and appellate litigation." Librarian of Congress Names New Copyright Judge, Library of Congress (Oct. 18, 2019), https://www.loc.gov/item/prn-19-101/librarian-of-congress-names-new-copyright-royalty-judge/2019-10-18/.  Moreover, as SoundExchange correctly notes in response to Music Choice's argument, while the Board did not initially author the disputed regulatory language, it now has jurisdiction over the regulations as the CARP's successor agency.  See Pl.'s Suppl. Br. at 8; see Determination of Rates and Terms for Business Establishment Services, 73 Fed. Reg. at 16,199. Thus, considering the particularly strong deference the Court must afford the Board's technical and policy expertise and the complex nature of the Board's decisions, the Court concludes that the Board possess unique knowledge or expertise regarding the regulatory language at issue in this case—even though it did not originally draft the regulations in question and has never presided over contested proceedings.

Finally, Music Choice contends that "if the mere presence of [ ] a dispute [regarding statutory or regulatory interpretation] were enough to warrant invocation of primary jurisdiction, the Board could be overwhelmed with referrals that it was never intended—nor budgeted—to handle."  Def.'s Suppl. Br. at 18.  This concern is without support.  Courts are, and will remain,

cautious in their invocation of primary jurisdiction, and the nature of the dispute in this case is not sufficient reason to deny making the referral to the Board.  See Miss. Power & Light Co., 532 F.2d at 418–19 (emphasizing that "courts should be reluctant to invoke the doctrine of primary jurisdiction[,]" and listing factors for the Court to consider before invoking the doctrine).  In fact, it is absolutely appropriate for the Court to refer disputes over ambiguous statutory or regulatory interpretation to the Board when in the Court's discretion the Board is best suited to offer guidance in the first instance due to its expertise.  See id.

Accordingly, the Court finds that because the issue of interpretation raised by this case is not "within the conventional experience of judges" and "is particularly within the [Board's] discretion[,]" Philip Morris, 787 F. Supp. 2d at 78, for the reasons stated above, the first two primary jurisdiction factors weigh in favor of referral.  The Court will next assess whether ruling on this issue without referring the matter to the Board would create a substantial danger of inconsistent rulings.

### 2.  Whether There Is a Substantial Danger of Inconsistent Rulings

SoundExchange argues that "referral to the Board would also mitigate any danger of inconsistent rulings" because while "[a] resolution by this Court would bind only the parties to this proceeding[,]" "if the Board provides guidance on the proper interpretation of its regulations, that would offer certainty to SoundExchange and all other [BES] licensees in any future disputes[.]"  Pl.'s Suppl. Br. at 9–10 (internal citations omitted).  Music Choice responds that "the Court's adjudication of this case by interpreting and then applying the definition of Gross Proceeds to the specific facts in dispute here would not create any readily apparent risk of inconsistent rulings."  Def.'s Suppl. Br. at 18.

"Among the central purposes of the primary jurisdiction doctrine is to encourage 'the desirable uniformity which would obtain if initially a specialized agency passed on certain types of administrative questions.'" Philip Morris, 787 F. Supp. 2d at 80 (quoting W. Pac. R.R. Co., 352 U.S. at 64).  Generally, where there are more parties affected by a given interpretative issue, the concern of inconsistent rulings is greater.  Cf. Sirius XM, 65 F. Supp. 3d at 155 (finding that uniformity was not a concern because the parties to the suit were the only parties affected by the rates in question).  The danger of inconsistent rulings is also higher where the interpretative issue raises complex and technical questions.  Cf. Lipton v. MCI Worldcom, Inc., 135 F. Supp. 2d 182, 191 (D.D.C. 2001) (finding no substantial danger of inconsistent rulings where resolving a tariff rate dispute required an understanding of the tariff, but no "insurmountable technical or intellectual hurdles.").

Here, the Court agrees with SoundExchange that referral is appropriate because obtaining guidance from the Board regarding the proper interpretation of the regulations at issue would mitigate a substantial risk of inconsistent rulings.  See Pl.'s Suppl. Br. at 9–10.  As SoundExchange correctly notes, "Music Choice is not the only [BES] provider that relies on the statutory license."  Id. at 9 (footnote omitted).  Indeed, SoundExchange and Music Choice were not the only parties involved when the Board issued its determination implementing the 2007 industry settlement.  See Determination of Rates and Terms for Business Establishment Services, 73 Fed. Reg. at 16,199 (listing Sirius Satellite Radio, Inc. and XM Satellite Radio among the parties subject to the final settlement).[6]  Therefore, while a ruling by the Court would only bind the parties to this suit, guidance by the Board would offer guidance to SoundExchange, Music Choice, and any other BES licensees who may have made similar calculations of their gross

---

[6] When this proceeding was commenced, Sirius Satellite Radio and XM Satellite Radio were separate entities, but they have since merged.  See Sirius XM, 65 F. Supp. 3d at 152 & n.1.

proceeds.  Additionally, this case presents "factual inquiries requiring the particular expertise of the [Board,]" cf. Lipton, 135 F. Supp. 2d at 191, as the parties' dispute goes beyond the mere application of the rates themselves, and involves the more complex question of whether the Board set the BES rates "intending the types of revenue at issue to be included in or excluded from the [G]ross [Proceeds] calculation[.]"  Sirius XM, 65 F. Supp. 3d at 156.

The Court finds Music Choice's contrary arguments unpersuasive.  First, Music Choice argues that because the Board "cannot and will not consider the specific facts related to the private dispute, apply its guidance to the individual royalty payment dispute, or even make recommendations to the district court related to the referred case," the Board's "ability to provide uniformity among individual cases[]" is "significantly limit[ed.]"  Def.'s Suppl. Br. at 19. However, while the Board has no enforcement power, its issuance of interpretive guidance to district courts could alone mitigate the substantial risk of inconsistent rulings, even if it ultimately falls to the courts to enforce the Board's guidance.  See Philip Morris, 787 F. Supp. 2d at 80–81.

Music Choice further contends that because the BES license rates and terms are subject to periodic adjustment proceedings, "[i]n the unlikely event any ruling in this case creates any unforeseeable inconsistencies or other problems, SoundExchange may seek to amend those regulations in the next proceeding before the Board in the ordinary course."  Def.'s Suppl. Br. at 19.  But the mere opportunity to amend the regulations to address any future inconsistent rulings does not mitigate the substantial risk of inconsistent rulings that could occur if this Court were to issue a ruling without seeking the Board's interpretive guidance first.  Cf. W. Pac. R. Co, 352 U.S. at 64–65 ("Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally

exercised, by <u>preliminary</u> resort . . . to agencies that are better equipped than courts by specialization[.]") (emphasis added).

Accordingly, because there is substantial danger of inconsistent rulings if the Court were to decide the regulatory interpretation issue in the first instance, the Court concludes that the third primary jurisdiction factor weighs in favor of referral to the Board.  The Court will next assess whether there has been a prior application to the Board with respect to this issue.

### 3.   Whether a Prior Application to the Board Has Been Made

Music Choice contends that "no prior application has been made to the Board, as would weigh in favor of invoking primary jurisdiction[,]" and that "SoundExchange cho[]se to bring this case directly in this Court without making any application to the Board[.]"  Def.'s Suppl. Br. at 19.  SoundExchange does not dispute this point.  <u>See generally</u> Pl.'s Suppl. Br.

"If prior application to the agency is present, this factor provides support for the conclusion that the doctrine of primary jurisdiction is appropriate," but if that is not the case, "this factor <u>may</u> weigh against referral of the matter to the agency on the basis of primary jurisdiction."  <u>Ellis</u>, 443 F.3d at 89 (internal citations omitted) (emphasis added).  Because SoundExchange filed its case in this Court without having made a prior application to the Board, this factor weighs against referral, but this alone does not compel denial of referral to the Board.  Accordingly, the Court will consider whether judicial economy concerns ought to affect the Court's assessment.

### 4.   Whether the Court Must Refuse to Refer the Matter to the Board in Light of Judicial Economy Concerns

Beyond the four factors that the Court must assess, Music Choice argues that "[r]eferring any portion of this case to the Board would unduly delay the proceedings—especially as the [B]oard could not issue a ruling on the ultimate merits of the case, or even consider the specific

facts or claims present in this case."  Def.'s Suppl. Br. at 20 (internal citations omitted).

Specifically, Music Choice contends "a referral to the Board would inject several years of delay

and considerable added expense into this case and would yield very limited—in scope and

utility—general guidance, after which the case would return to the [C]ourt for full discovery and

further proceedings to apply that guidance to the unique facts of this case."  Id. at 22.  Music

Choice further asserts that "[k]eeping the entire case in the district court is more likely to result

in a speedy and fair resolution and as such, weighs against referring any part of this case to the

[Board] in the first instance."  Id.

Courts "have sometimes refused to recognize a primary jurisdiction claim where a federal

agency referral would result in undue delay."  Ellis, 443 F.3d at 90.  Where the potential delay is

determined to be "too great to justify a straightforward referral," the Court may "either choose

not to refer the matter to the agency, or take such other action as it deems appropriate."  Am.

Auto. Mfrs. Ass'n v. Mass. Dept. of Envtl. Prot., 163 F.3d 74, 81–82 (1st Cir. 1998).  The

significance of this delay is weighed against any benefit that might be achieved by having [the

agency] resolve" the dispute.  See Nat'l Commc'ns Ass'n v. Am. Tel. & Tel. Co., 46 F.3d 220,

225 (2d Cir. 1995) (finding that "[s]ince the district court can conclude this matter far more

expeditiously, a potential delay of even two years" outweighed the benefits of agency referral).

Again, Music Choice's argument is unavailing.  Music Choice claims that "[p]rior

experience shows that invoking primary jurisdiction in this case is likely to result in a very long

delay."  Def.'s Suppl. Br. at 21.  According to Music Choice, "[i]n Sirius XM, the [C]ourt's

referral to the Board resulted in a more than three-year delay after which, having received the

regulatory guidance of the Board, the court still had to adjudicate the payment dispute between

the parties."  Id. (first citing Sirius XM, 65 F. Supp. 3d at 157; then citing Determination of

<u>Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio</u>
<u>Services</u>, 82 Fed. Reg. 56,725, 56,725–56,735 (Nov. 30, 2017)).  While <u>SiriusXM</u> is clearly
analogous to this case in many respects, the particular length of delay following the referral is
not necessarily indicative of any delay resulting from a referral here, because there is no
significant evidence to support a finding in the instant case that referral would result in this type
of inordinate delay.  <u>See</u> <u>Am. Auto. Mfrs. Ass'n</u>, 163 F.3d at 81–82 (stating that "[i]n cases
where the potential for delay is found to be too great to justify a straightforward referral," the
Court may exercise discretion not to refer).  In any event, the Court has already concluded that
the issue raised by this case requires the expertise of the Board and that declining to refer the
case to the Board presents substantial risk of inconsistent interpretations.  <u>Cf.</u> <u>Nat'l Commc'ns</u>
<u>Ass'n</u>, 46 F.3d at 223.  Therefore, with a request from the Court that the Board address the
question being referred to it as expeditiously as possible, the Court finds that the balance of
factors strongly weigh in favor of the Court exercising its discretion under the primary
jurisdiction doctrine to refer this matter to the Board, despite the risk of further delay.

### III.   CONCLUSION

In sum, the balance of all the relevant factors, including judicial economy, weigh in favor
of referring the question of regulatory interpretation raised by this case to the Board pursuant to
the doctrine of primary jurisdiction.   As this Circuit has stated, "[i]n general, when primary
jurisdiction lies with an administrative agency, the district court should stay the proceedings in
front of it[.]"  <u>Am. Ass'n of Cruise Passengers v. Cunard Line, Ltd.</u>, 31 F.3d 1184, 1187 (D.C.
Cir. 1994).  Accordingly, the Court will stay all proceedings in this case, pending a decision by
the Board.

**SO ORDERED** this 20th day of December, 2021.[7]

REGGIE B. WALTON
United States District Judge

---

[7] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.